**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION**

PATRICIA M. SKELLY

       Plaintiff,

v.

                                      Case No.: 3:08-cv-428-MCR/MD

OKALOOSA COUNTY, FLORIDA BOARD OF
COUNTY COMMISSIONERS, in its
official capacity; NOLAN HAYNES,
in his individual capacity; DENNIS FIELDS, in
his individual capacity;

       Defendants,
_____/

**PLAINTIFF'S MEMORANDUM OF LAW OPPOSING DEFENDANTS'
HAYNES' AND FIELDS' AMENDED MOTION FOR SUMMARY JUDGMENT**

     Plaintiff, Patricia Mary Skelly, by and through her undersigned attorney, opposes Defendants' Nolan Haynes' ("Haynes") and Dennis Fields' ("Fields") Amended Motion for Summary Judgment and states as follows:

**I.    Introduction**

     Defendants Haynes' and Fields' Amended Motion for Summary Judgment should be denied. The material facts, viewed in a light most favorable to Ms. Skelly, as the non-moving party, would support a jury verdict against both Haynes and Fields for excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution, as actionable under 42 U.S.C. §1983,

and for common law battery under Florida state law. Additionally, because it would be obvious to a reasonable officer that Defendants' Haynes' and Fields' uses of force against Ms. Skelly violated clearly established law, neither Defendant is entitled to qualified immunity.

Ms. Skelly's claims against Defendants arise from two separate incidents at the Okaloosa County Jail ("the jail"). The first incident occurred when Ms. Skelly was first brought to the jail by the Valparaiso Police Department and was tased repeatedly, excessively and unnecessarily by Defendant Haynes. Defendant Fields was not involved in this first incident. The second incident occurred when Ms. Skelly was returned to the jail after a failed attempt to transport her to North Okaloosa Medical Center (to treat her for a head laceration suffered during the first incident). When Ms Skelly was returned to the jail during this second incident, Defendant Fields, at the instruction of Defendant Haynes, tased her repeatedly, excessively and unnecessarily. In their Motion for Summary Judgment[1], Defendants attempt to introduce as "material" purported (and disputed) facts regarding events which occurred both prior to and subsequent to these two incidents. For reasons stated in the sections below addressing the individual claims against each Defendant, and in Plaintiff's Statement of Disputed Material Facts, filed separately herewith, the court should not consider these immaterial, but inflammatory and prejudicial, "facts" when ruling on Defendants' motion.

Summary judgment is only appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Only where the record

---

[1] For brevity's sake, Ms. Skelly will refer to the Defendants' Amended Motion for Summary Judgment (Doc. 92) simply as their Motion for Summary Judgment.

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996) (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir.1993)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir.2004). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir.1995). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir.2003).

## II.   Defendant Haynes' Motion for Summary Judgment should be Denied

### A.   Material facts viewed in a light most favorable to Ms. Skelly[2]

Prior to Ms. Skelly's initial arrival at the jail (and indeed, at all times during the use of force incident), Defendant Haynes' only knowledge about her was that she was a "combative signal 20" ("signal 20" being code referring to someone who appears mentally ill"). (Haynes deposition, p. 6; Minor deposition, p.17). He received no information about the circumstances of her arrest, any events preceding the arrest, or any behavior exhibited by her prior to her arrival other than the "combative signal 20" description. (Haynes deposition, pp. 6, 9).  Any and all references by Defendants in their summary judgment motion as to any alleged resistance by Ms. Skelly during her arrest by the Valparaiso police, or any other incidents allegedly involving Ms. Skelly prior to her arrival a the jail, are not material to the excessive force claim. Only those facts known by Defendant Haynes at the time he decided to repeatedly tase Ms. Skelly are material and relevant to the issue of whether his use of force violated Ms. Skelly's constitutional and state law rights. Defendant Haynes, or any reasonable officer in Defendant Haynes' position, cannot rely on information unknown to him to justify the amount and type of force used against a suspect. Therefore, this court cannot consider the purported "material facts" offered by Defendants regarding any specifics of Ms. Skelly's allegedly violent actions or behaviors in ruling on Defendant Haynes' summary judgment motion, despite Defendants' attempts to pollute the record with these immaterial (and disputed) allegations.

---

[2] While Ms. Skelly has filed a separate Statement of Disputed Material Facts in opposition to Defendants' Motion for Summary Judgment, for purposes of this memorandum Ms. Skelly recites only those facts which are viewed in a light most favorable to her.

Upon the arrival of the Valparaiso police and Ms. Skelly at the jail, Defendant Haynes and correctional officer Tracy Minor[3] went to the jail's vestibule area to receive the "combative signal 20" female. The vestibule is a room situated between the sally port (a securely caged receiving area for vehicles picking up and dropping off suspects at the jail) and the jail's admission, classification and release ("ACR") area. The vestibule can be closed off from the sally port and the ACR area by sliding metal security doors at opposite ends of the room. The sally port's security gates are closed prior to an arriving suspect being taken out of the transport vehicle, and once these gates are closed, a suspect cannot escape the jail from the sally port.

Ms. Skelly arrived at the jail's sally port in the back of a Valparaiso police vehicle. The sally port was closed per procedure prior to Ms. Skelly being removed from the back of the vehicle, in handcuffs, by the Valparaiso officers. The officers escorted Ms. Skelly into the vestibule, where they turned her over to officer Minor. The door between the vestibule and the sally port was closed, which would have prevented any attempted escape by Ms. Skelly into the sally port area. (Haynes deposition, p. 15). The Valparaiso officers then proceeded into the ACR area, apparently to fill out paperwork. Defendant Haynes testified that he already had his taser drawn and in his hand at the time of Ms. Skelly's arrival. (Haynes deposition, p. 28).

Ms. Skelly testified that when she was brought to the jail and turned over to corrections personnel, while still in handcuffs, she was knocked forward from behind, causing her to fall to the

---

[3] Ms. Minor was married subsequent to these events and now uses her married name, Braxton. However, to avoid confusion, Ms. Skelly will still refer to her using her maiden name for purposes of this memorandum.

5

ground. (Skelly deposition, pp.117-122). She could not say whether the blow from behind was a shove or a taser shooting her in the back, as she did not see what kind of force had caused her to fall. (Skelly deposition, pp.130-132). Defendant Haynes testified that she fell due to him tasing her. (Haynes deposition, pp. 28-31). After she was on the ground, Ms. Skelly was tased approximately eight or nine times before she recalled losing consciousness. (Skelly deposition, p.117). Ms. Skelly testified that this attack from behind and subsequent tasing was unprovoked, as she had not been given any commands at that point, and would have been compliant with any commands given, as she was intimidated. (Skelly deposition, pp.132-134). The only correctional officer who admitted to tasing Ms. Skelly in the vestibule was Defendant Haynes, and the log[4] from his taser indicates that he tased Ms. Skelly at least eight or nine times, possibly ten. (See Haynes' taser log, entries 443-452).

Accepting Ms. Skelly's testimony regarding the events from the first incident as being true, Defendant Haynes tased her without provocation or reason at least eight or nine times while she was handcuffed behind her back and having been knocked to the ground. To ignore Ms. Skelly's account of the facts would require to court to weigh her credibility against that of other witnesses, something

---

[4] The taser electronically records by date and time each trigger pull. If the trigger of the taser is held down for more than five seconds, the default amount of time the taser delivers a charge, it also records additional trigger pulls every time the trigger is held down for more than five seconds. In theory, a taser could deliver one continuous charge of energy until its batteries went dead if the trigger were held down long enough. In such an instance, the log would reflect a trigger pull from the time of the initial trigger pull and every five seconds thereafter.


it is not allowed to do in the context of a summary judgment motion.[5]

### B. Defendant Haynes is not entitled to summary judgment under these facts

In his Motion for Summary Judgment, Haynes himself cites a case which would preclude qualified immunity and summary judgment for him under the facts recited in the preceding section. In *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002), the court denied qualified immunity in an excessive force case, despite its conclusion that the officer had legitimate grounds to arrest the plaintiff, on the basis of the plaintiff having been secured with handcuffs and posing no further risk of harm or flight. "Even though Ferraro undoubtedly possessed the lawful power to effect a custodial arrest and secure Lee with handcuffs, a reasonable officer could not possibly have believed that he then had the lawful authority to take her to the back of her car and slam her head against the trunk after she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed. Once an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose." *Id.* at 1199. Accepting Ms. Skelly's testimony as being true, as the court must for purposes of summary judgment, she was tased from behind while handcuffed and having offered no resistance or non-compliance to Haynes or the other correctional officers. She was then tased up to nine more times after having fallen to the ground and suffering a head laceration. (See Haynes taser log).

---

[5] The court is also not allowed to disregard Ms. Skelly's testimony even if it contradicts allegations in her own Complaint. *See Few v. Cobb County, Ga.*, 147 Fed. Appx. 69, 70-71 (11th Cir. 2005) (reversing summary judgment, including finding of qualified immunity, in favor of defendant where district court disregarded sworn testimony of the plaintiff due to it contradicting allegations in plaintiff's complaint).

In *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) the Eleventh Circuit set forth the two ways a plaintiff may overcome the qualified immunity of a governmental defendant sued in his or her individual capacity. First, a plaintiff may produce prior controlling caselaw which is similar enough to the case at issue to place the defendant on notice that his conduct violated the constitution. Second, "an excessive-force plaintiff can overcome qualified immunity . . . by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Id.*

In the instant case, there is a host of controlling caselaw which would place Haynes on notice that repeatedly tasering a handcuffed, compliant and non-threatening Ms. Skelly would violate Ms. Skelly's rights under the Fourth Amendment of the constitution. *See Lee*, 284 F.3d 1198-1199; *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (11th Cir. 2000) (denying qualified immunity to an officer who ordered his K-9 to attack a suspect who was compliant and laying on the ground); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000).(denying qualified immunity to officers who beat compliant, handcuffed plaintiff). Therefore, Ms. Skelly satisfies the traditional test for overcoming qualified immunity by showing that the contours of the controlling law were sufficiently drawn for defendant to be on notice that his conduct violated her constitutional rights.

Ms. Skelly's claim would also satisfy the second test from *Smith v. Mattox*, in that any reasonable officer would inevitably conclude, even in the absence of controlling law, that Haynes' actions in repeatedly tasing a handcuffed and compliant Ms. Skelly violated her right to be free from excessive force under the constitution. Haynes also cites *Buckley v. Haddock*, 292 Fed.Appx 791

(11th Cir. 2008) for authority that his use of the taser in this case was not excessive. However, *Buckley* is easily distinguishable from the instant case (without taking into consideration Ms. Skelly's testimony that she was tased for no reason at all). In *Buckley*, the confrontation between the officer and the suspect took place at night on the side of a busy highway, a fact that the authoring judge repeatedly stated. *See id.* at 792, 794, fn. 6, 795, 796 and 798. In the instant case, the alleged confrontation took place within the controlled environment of a locked jail vestibule. In *Buckley*, the officer was alone and had to radio and wait for backup to assist with the arrest the plaintiff. *See id.* In the instant case, there were no less than four correctional officers present who could have restrained Ms. Skelly: Haynes, Minor, Wells and Andrus. In *Buckley*, the officer warned the plaintiff each time before he issued a tasing. *See id.* In the instant case, the facts are disputed as to whether Defendant Haynes issued a warning before the first tasing, and are undisputed that warnings were not issued before any of the subsequent eight or nine tasings. (Haynes deposition, p.28 "She jerked, I fired."; p.31 Q "Did you warn Officer Minor that you were about to use the taser?" A "Didn't have time."). In *Buckley*, the officer tased the plaintiff a total of three times. *See id.* at 796. Significantly, the concurring opinion would have found the third tasing to have been an unconstitutional use of force, but would have upheld the summary judgment on qualified immunity grounds due to lack of clearly established law. *See id.* at 799 (Dubina, concurring). The dissent would have denied summary judgment and qualified immunity entirely. *See id.* at 799 (Martin, dissenting). In the instant case, where a jury could conclude that Defendant Haynes tased Ms. Skelly between eight and ten times, it is doubtful that the *Buckley* court would have had any difficulty in ruling that the sheer number of tasings was so beyond reason that it would violate clearly established law even in the absence of

controlling precedent.

The photos of Ms. Skelly's taser injuries (filed separately), coupled with Defendant Haynes' taser log showing that he tased her between eight and ten times (See Haynes taser log), along with the fact that Ms. Skelly required hospital care for her head laceration from the fall due to the tasing, demonstrate that her injuries were far from *de minimis*. Accordingly, Defendant Haynes is not entitled to qualified immunity or summary judgment as to Ms. Skelly's claim under 42 U.S.C. §1983.

The nature of the facts viewed in a light most favorable to Ms. Skelly would also allow a jury to conclude under Florida state law (common law battery) that Haynes clearly exceeded the reasonable force he was entitled to use against Ms. Skelly – under Ms. Skelly's account of the events, Haynes would be entitled to use no force at all – and would also allow a jury to conclude that Haynes' actions were willful and wanton enough to allow him to be sued individually under Fla.Stat. §768.28(9).

Viewing the facts in a light most favorable to Ms. Skelly, this court must deny Haynes' Motion for Summary Judgment.

**III.   Defendant Fields' Motion for Summary Judgment should be Denied**

    **A.   Material facts viewed in a light most favorable to Ms. Skelly**

After Ms. Skelly suffered a head laceration from falling face first to the hard tile floor of the jail due to being tased by Defendant Haynes, the jail's medical staff refused to accept her for intake until she had been taken to the hospital for examination. (Minor deposition, p.40). Officers Tracy

Minor and Patricia Mabou[6] were assigned to transport her to the North Okaloosa Medical Center ("NOMC"). (Minor deposition, p.40). Ms. Skelly has no independent recollection of any of the events from the time she was tased about eight or nine times by Defendant Haynes until the time she awoke in the NOMC and was having a urinary catheter inserted into her. Therefore, she has no knowledge of the alleged events which took place during what, for purposes of this motion, will be described as the "second incident," which entails the use of force by Defendant Fields against Ms. Skelly which is the basis of her claims against him.

According to the jail's incident reports and the testimony of the correctional officers involved, Ms. Skelly was being transported to the NOMC by officers Minor and Mabou in the back of a transport vehicle equipped with a cage (separating the front and back seats) with her hands handcuffed behind her back and leg irons on. (Mabou Deposition, Exhibit 1; (Minor deposition, p.41). During this initial transport, according to officers Minor and Mabou, Ms. Skelly slipped her cuffs from behind her back to in front, and was struggling in the back of the vehicle. (Minor deposition, p.41). When Minor and Mabou radioed the jail for instruction, Defendant Haynes ordered them to return her to the jail. (Minor deposition, p.41).

Upon their return to the jail from the failed attempt to transport Ms. Skelly to NOMC, the transport vehicle was secured in the sally port, and Defendant Haynes, officers Andrus and Wells, and Defendant Fields were present to assist officers Minor and Mabou with re-securing Ms. Skelly's

---

[6] Ms. Mabou was married subsequent to these events and now uses her married name, Foley. However, to avoid confusion, Ms. Skelly will still refer to her using her maiden name for purposes of this memorandum

11

restraints.(Fields deposition, pp. 7, 10). Defendant Fields was armed with a taser, which he was required to carry in his hand during the entire second incident due to having no holster issued to him in which to hold it. (Fields deposition, pp. 11-12, 18). When the vehicle was parked in the sally port, Ms. Skelly, still handcuffed (in front) and wearing leg shackles, allegedly grabbed the cage separating the front and back seat of the car. (Fields deposition, pp. 12-13). The only physical attempt Defendant Fields may have made to remove Ms. Skelly's hands from the cage prior to tasing her was half-hearted, one-handed attempt to remove Ms. Skelly's hands from the cage: "I did kind of a tug on her hand in a slight manner, not nothing too hard. . ." (Fields deposition, p. 13). A reading of the facts in a light most favorable to Ms. Skelly would use the description in Defendant Fields' Use of Force Report, wherein he states: "Officer Wells and Officer Mabou managed to get a hold of the inmate. At that time the inmate grabbed the cage in the car and refused to release her hold. At that time per Sgt. Haynes I applied a drive stun to the inmate's lower left back which made her release her hold on the cage." (Fields Use of Force Report). This report makes no mention of any attempt by Defendant Fields or any other officer to try to get Ms. Skelly to release her grip on the cage through a lesser use of force, such as pressure point techniques.

Defendant Fields applied his taser to Ms. Skelly in "drive stun[7]" mode an unknown number of times, causing her to release her hold on the cage (the total number of tasings for the second incident is approximately seven or eight, but it is unclear how many occurred inside the vehicle and

---

[7] "Drive stun" is when the taser is touched directly to the subject, as opposed to a "probe deployment", wherein an air cartridge with barbed probes attached to wires is fired at the subject. "Drive stun" is purely a pain compliance mode.

how many occurred outside). (Fields deposition, p. 15; Fields taser log, entries 416-423).

After Ms. Skelly was removed from the vehicle in handcuffs and leg shackles and after having been tased an unknown number of times, the officers present attempted to re-secure her handcuffs behind her back. Despite the fact that there were at least six correctional officers present to accomplish this task, Ms. Skelly allegedly was able to pull her hands up to her mouth and bit down on the fingers of one hand (hard enough to cause an indentation, but not hard enough to draw blood). Once again, Defendant Fields solution to this problem was to tase Ms. Skelly repeatedly in drive stun mode, causing her to release her fingers and allowing the officers to gain control of her hands. (Fields Use of Force Report; Fields Deposition, pp. 19-25). Again, a jury could determine from Defendant Fields' taser log that the total number of times he tased Ms. Skelly during this second incident was seven or eight. (Fields taser log). The photographs of Ms. Skelly's taser wounds demonstrate that she suffered more than just *de minimis* injury. (Photos of Skelly taser wounds).

As argued in the case of Defendant Haynes' excessive tasing of Ms. Skelly, Defendant Fields is not entitled to summary judgment or qualified immunity under these circumstances. Using the taser as weapon of first resort seven or eight times against Ms. Skelly in response to Ms. Skelly grabbing the transport vehicle's cage and then biting her own fingers (without enough force to draw blood) when there are at least six correctional officers present to help control Ms. Skelly goes beyond the bounds of reason. Under *Smith v. Mattox*, 127 F.3d at 1419 (11th Cir. 1997), Defendant Fields' "conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [Fields], notwithstanding the lack of caselaw." The sheer number of times Defendant Fields tased Ms. Skelly in the completely controlled

environment of the jail's locked sally port with at least five other officers available to assist in restraining her, shocks the conscience. As in the *Buckley*, *supra*, concurring opinion, while the court may find the first or second tasing to pass constitutional muster, the seventh or eighth must clearly not. This court is not presented with a *Buckley* scenario of a lone officer beside a busy highway at night tasing a subject three times. Under those circumstances, the concurring opinion found that qualified immunity applied to the unconstitutional third tasing. *See id.* In the instant case, in a completely controlled environment with many officers available to help, seven or eight tasings is unconscionable, and it would be readily apparent to any officer that using such force under those circumstances was unconstitutionally excessive even in the absence of any controlling caselaw. Accordingly, this court should deny Defendant Fields' Motion for Summary Judgment as to Ms. Skelly's §1983 claim.

For these same reasons, the court should deny Defendant Fields' Motion for Summary Judgment as to Ms. Skelly's state law battery claim. A jury could determine from the facts presented in a light most favorable to Ms. Skelly that Defendant Fields exceeded the amount of force a law enforcement officer was entitled to use under these circumstances, thereby constituting common law battery. It could further find that such actions were taken in "bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property," which is the standard for individual liability of government agents under Fla.Stat. §768.28(9). As such, the court should deny Defendant Fields' Motion for Summary Judgment as Ms. Skelly's battery claim as well.

**IV.	Conclusion**

Defendants Haynes' and Fields' Motion for Summary Judgment should be denied. The material facts, viewed in a light most favorable to Ms. Skelly, demonstrate that Haynes' eight to ten tasings and Fields' seven to eight tasings of Ms. Skelly violated her clearly established constitutional right to be free from excessive force. The circumstances of the tasings, in that they were in the controlled environments of the jail's vestibule and sally port, respectively, with numerous other law enforcement officers present to assist Haynes and Fields, would place these Defendants on notice that their use of force violated Ms. Skelly's constitutional rights, even in the absence of controlling caselaw. As to the use of force by Defendant Haynes, Ms. Skelly's testimony that he repeatedly tased her without provocation while she was still handcuffed certainly creates an issue of fact which must go before a jury. For these same reasons, a jury could find that Defendants Haynes and Fields committed common law battery upon Ms. Skelly, and that this battery was sufficiently willful and wanton to subject these defendants to individual liability under Fla.Stat. §768.28(9). Accordingly, Defendants Haynes' and Fields' Motion for Summary Judgment should be denied in its entirety.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished to Roper & Roper, P.A., 116 N. Park Avenue Apopka, FL 32703 via electronic filing this 13th day of July, 2009.

/s/Robert T. Bleach
Robert T. Bleach
Florida Bar No: 089095
Soloway Law Firm
1013 Airport Blvd.
Pensacola, Florida 32504
(850) 471-3300 (T)
(850) 471-3392 (F)
Attorneys for Plaintiff