UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**PATRICIA M. SKELLY,**

        **Plaintiff,**

v.                                Case No. 3:08cv428/MCR/MD

**OKALOOSA COUNTY, FLORIDA
BOARD OF COUNTY COMMISSIONERS,**
in its official capacity; **NOLAN HAYNES,**
in his individual capacity; **DENNIS FIELDS,**
in his individual capacity,

        **Defendants**.
_____/

# O R D E R

Plaintiff Patricia Skelly has filed a three-count complaint against Defendants Okaloosa County, Florida, Board of County Commissioners ("the County"); and Nolan Haynes and Dennis Fields, in their individual capacities, alleging claims of excessive force in violation of the Fourteenth Amendment, *see* 42 U.S.C. § 1983, and state law battery. Pending before the court are summary judgment motions filed by the defendants (docs. 91 & 92), which the plaintiff opposes (docs. 95 & 96). The court now renders judgment, having fully considered the record and the parties' arguments.

**Background**[1]

In this suit, Patricia Skelly complains that Sergeant Nolan Haynes and Officer Dennis Fields, both of the Okaloosa County Department of Corrections, engaged in the

---

[1] For the limited purposes of this summary judgment proceeding, the court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," in this case Skelly, *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1256 (11th Cir. 2008) (internal marks omitted), bearing in mind that "what is considered to be the facts at the summary judgment stage may not turn out to be the actual facts if the case goes to trial," *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

use of excessive force by shocking her with a Taser gun while she was a pretrial detainee.[2] The undisputed evidence of events leading up to the two Taser incidents at issue includes the following.[3]  On March 27, 2005, Sergeant Alan Ratcliff of the Valparaiso Police Department was called to the Budget Inn in Valparaiso, Florida, after the hotel manager reported that a guest had failed to check out and would not answer the door or telephone. Sergeant Ratcliff forced his way into the room and advised the occupant (later confirmed as Skelly) that she was expected to leave.  Skelly appeared to understand and began packing.  Later in the day, however, she was still in the room and hotel management sought assistance once more.  Sergeant Ratcliff returned and again used force to enter the room.  Skelly was found constantly pacing back and forth in the room.  Ratcliff arrested her for trespassing when she refused to leave despite his repeated requests.  At that point, Skelly became combative and began yelling statements like, "Ron, go away, you're not God." (Doc. 93-11, at 4.)  Ratcliff had difficulty getting her handcuffed because she was struggling; in an attempt to avoid injuring her, he handcuffed her with her hands in front. Skelly continued to resist arrest as Ratcliff escorted her to the patrol car, yelling, pushing, kicking, and grabbing at the door frames.  After Ratcliff forcibly placed Skelly in the patrol car, she kicked him in the chest and abdomen with enough force to knock him breathless.

---

[2]  The Eleventh Circuit has defined the term "Taser" as follows:

> The term "Taser" refers to an electronic device used to subdue persons without causing fatal harm. A Taser is a battery-charged unit approximately the size and appearance of a flashlight. It holds two replaceable cartridges, each containing a hooked barb, or dart, attached to the cartridge by a long, electricity-conducting insulated wire. Each dart can be fired independently by depressing the corresponding lever located on the frame of the Taser. When the probes make contact with the target, the Taser transmits high voltage electrical current along the wires and into the body of the target. In addition, after the Taser's initial "shot" has been fired and contact has been made, an electrical current may be transmitted through the wire to the target by repeatedly pressing on the Taser's lever.

Chaney v. City of Orlando, 483 F.3d 1221, 1223 n.1 (11th Cir. 2007); *see also Mann v. Taser In'l, Inc.*, 588 F.3d 1291, 1298 n.1 (11th Cir. 2009).

[3]  Skelly disputes the materiality of this background evidence, but not its reliability.  She argues that it is not relevant to the state of mind of Haynes and Fields because they were not aware of these details of her arrest at the time of the Taser incidents.  While the court agrees that background information which was unknown to the officers at the time of the events in question is not relevant to their state of mind, it nonetheless is undisputed evidence of Skelly's conduct immediately prior to arriving at the jail.

Case No. 3:08cv428/MCR/MD

She continued kicking the inside of the patrol car as he transported her to the Valparaiso Police Department ("the police department") for processing. Upon their arrival, Skelly became coherent and compliant until placed in a holding cell, where she resumed yelling, kicking and stomping. Skelly was charged with trespassing and resisting arrest with violence, in violation of state law.[4] The police department then radioed to the Okaloosa County Jail (or "the jail") that a "combative signal 20"[5] was en route and transported Skelly to the jail, where she was met by Defendant Sergeant Haynes and a female corrections officer, Tracy Minor.[6]

Skelly stated in her deposition that she was handcuffed during the transport, and as she entered the jail, she was immediately knocked down from behind without provocation and repeatedly shocked by a Taser until she lost consciousness. She stated, "The minute I came around the corner, somebody threw me to the ground, and that's when I started getting Tasered. It was that fast." (Doc. 102-1, at 4.) She asserts that prior to this, the officers said nothing to her; no one said anything threatening; she said nothing to them; and she saw six to eight people standing around. She also testified that she did not know why she had been arrested. Skelly testified in her deposition that when she awoke, she was in the hospital.[7] Skelly points to the Taser log entries as confirmation that Haynes

---

[4] In state court, Skelly later pleaded *nolo contendere* to both charges and the state court withheld adjudication. (*See* doc. 93-1.)

[5] The officers understood the code "signal 20" to mean the arrestee was possibly mentally disturbed. (*See* doc. 93-13, at 2-3.) The complaint asserts that Skelly in fact suffered from bipolar disorder and other mental illnesses, but she denied this history in her deposition.

[6] Minor is now known as Tracy Braxton, but the court will refer to her as Minor to avoid confusion in the record.

[7] In the complaint, Skelly alleged that she regained consciousness after Haynes initially used the Taser; she then found herself being physically restrained by Officer Andrus and Officer Minor. The complaint also states Skelly then began struggling out of fear when she saw Haynes approach her again with the Taser. According to the complaint, she begged him not to hurt her anymore but he nevertheless Tasered her numerous additional times. (Doc. 3, at 6.) When a party's deposition testimony contradicts the allegations in the complaint, the court must credit the later testimony. *See Leary v. Livingston County*, 528 F.3d 438, 444 (6th Cir. 2008) (noting "a claimant may not create a triable issue of fact by saying one thing in a complaint and something else in a deposition"). An inconsistency between an allegation in a complaint and a party's deposition testimony ordinarily goes to credibility, a matter which cannot be resolved at summary judgment. *See Few v. Cobb County, Ga.*, 147 Fed.Appx. 69, 70-71 (11th Cir. 2005) (unpublished). The court notes, however, that these two separate versions of the incident are utterly at odds with one another and not

used the Taser eight to ten times during this incident.

According to Sergeant Haynes' report, which Skelly disputes, he and six other officers were present when Skelly arrived at the jail. She appeared to be compliant as she entered the jail's security vestibule accompanied by Valparaiso police officers. Haynes had his Taser drawn when she arrived, which he said was standard practice because he had received notice that she was a combative subject. Officer Minor stated Skelly appeared to be compliant at first, so she removed the handcuffs and instructed Skelly to place her hands on the wall and spread her feet apart for a pat-down search. Skelly did not comply, however, and refused several requests to place or keep her hands on the wall while Minor attempted to complete the pat-down search. Minor stated Skelly became more and more agitated as she conducted the pat-down, swinging elbows at Minor and saying she wanted to go outside. When Minor finished the pat-down search, she and Haynes began to escort Skelly into the receiving area but Skelly physically resisted and positioned her right hand on the door frame, grabbing on to prevent entering. Haynes stated that when Skelly jerked her arm away from Minor, he fired the Taser: "She jerked, I fired." (Doc. 93-8.) Although Haynes did not remember giving a warning prior to using the Taser (he thought it had happened too quickly), two other officers present reported that Haynes gave a warning. As already noted, Skelly testified that no one said anything prior to knocking her down.

Haynes and other officers present stated that on the first Taser shock, Skelly immediately fell to the ground and injured her head in the process. Contrary to Skelly's assertion that she did not resist but was Tasered until unconscious, the officers who were present stated that she began to resist again after falling. Minor stated she tried to handcuff Skelly immediately after she fell but Skelly resisted by kicking and swinging her arms as soon as the shock wore off. Haynes stated that when Skelly began to get up, he pulled the trigger a second time, but unbeknownst to him, one of the Taser probes had become dislodged, lessening the effect of the charge. Haynes reported he then attempted to "drive stun" Skelly into compliance, which involves touching the front of the Taser on the person to deliver the charge; however, Haynes reported that this attempt was also

---

reconcilable on an issue which was within Skelly's personal knowledge.

Case No. 3:08cv428/MCR/MD

ineffective because he could not make good continuous contact due to Skelly's continued thrashing. Haynes then reloaded the probes, successfully fired the Taser, and Skelly was immediately incapacitated and restrained. A nurse determined that Skelly needed sutures for a laceration over her right eye, which resulted from her fall after the first shock, and Haynes directed that Skelly be taken to the North Okaloosa Medical Center.

The second Taser incident, which occurred within approximately 30 minutes of the first, happened after officers who were attempting to transport Skelly to the medical center were forced to return to the jail to re-position Skelly's restraints due to Skelly's behavior during the transport.[8] Skelly has no recollection of this incident, and does not present any evidence to dispute the facts recited by the officers.[9] The record indicates that Skelly had been handcuffed behind her back and shackled with leg irons for the transport to the medical center by Officers Minor and Mabou. While en route, Skelly reportedly began manipulating her restraints – she had moved the handcuffs from behind her back, through her legs, and in front of her – and was attempting to get out of the vehicle. Skelly was pounding on and kicking windows and grabbing at the cage separating the front and back seats. When Minor reported this by radio, Haynes directed them to return immediately for the purpose of applying additional restraints. When they returned to the jail, Skelly kicked Haynes and struggled to resist the officers' attempts to remove her from the vehicle. Skelly then grabbed the cage and refused to release her hold. In his use-of-force report, Officer Fields states that he applied a drive stun to Skelly's lower left back as instructed by Haynes, which succeeded in getting her to release her hold on the cage, and officers were then able to remove her from the vehicle. The report does not state whether Fields gave a verbal command or warning to Skelly prior to applying the Taser shock to loosen her

---

[8] Police reports indicate that Haynes' use of force occurred at 15:20 (3:20 p.m.), Officer Patricia Maybou (now known as Patricia Foley) responded to transport Skelly to the medical center at 15:30 (3:30 p.m.), due to the laceration on Skelly's head. Fields' use of force after the failed transport occurred at 15:50 (3:50 p.m.). Teresa White, a nurse at the medical center, testified that the first entry in Skelly's hospital admission record is noted at 16:15 (4:15 p.m.). Skelly presents no evidence to contradict these times.

[9] The evidence about what occurred during this incident, therefore, is drawn entirely from the officers' statements and reports. *See Fennell v. Gilstrap*, 559 F.3d 1212, 1214 n.1 (11th Cir. 2009).

Case No. 3:08cv428/MCR/MD

grip.[10]

According to Fields' undisputed report, after removing Skelly from the vehicle, the officers laid her on the ground face down:

> Officers Andrus and Wells attempted to get the inmate off her hands but she refused to do so [and] grasped herself to further resist their efforts. I again applied a drive stun to the inmate's lower right back region. The drive stun was unsuccessful. I applied another drive stun to the lower right region of the inmate's back, this attempt was successful. Officers Andrus and Wells then removed the inmate's left hand restraint and placed her right hand behind her back. At that time, Inmate Skelly managed to get her left index and middle finger in her mouth and began biting herself despite efforts by Officers Wells and Andrus. I applied another drive stun to the inmate's right hamstring, after refusing [an] order to remove her fingers from her mouth, which was unsuccessful. At that time, per Sgt. Haynes I applied another drive stun [to] the back left shoulder region which was successful in the release of her fingers. At that time, we were successful in restraining the inmate behind her back.

(Doc. 103-6.)[11] Skelly was then transported to the North Okaloosa Medical Center, where her combative behavior forced the medical personnel to strap her down and medicate her. Nurse Teresa White was on duty when Skelly arrived, and she testified that Skelly was thrashing around, yelling, kicking, and flopping everywhere. She testified Skelly was screaming, "I will die for Ronnie D" over and over. (Doc. 91-12, at 4.) Additionally, White testified that Skelly appeared to be having a psychotic episode or was on some type of chemical causing her behavior.[12] Pictures of Skelly's wounds show an abrasion near her right eye and several burn marks on the back of her upper right thigh, her front upper left thigh, and her upper and lower back, as well as one mark on her left mid-section.

---

[10] In his deposition testimony, Fields stated he initially attempted to talk and reason with Skelly to get her to let go of the cage, but she disregarded his verbal requests and warning. Fields testified that he gave a specific warning that he would have to use the Taser if she did not release her hold. (Doc. 93-6.) Skelly disputes Fields' deposition testimony, arguing that a jury could choose to believe his report, which does not mention any discussions or warnings prior to the Taser use, as opposed to his deposition testimony that he first attempted to reason with and warn her. The court must construe the record in the light most favorable to Skelly, so for purposes of this summary judgment motion, the court will not consider Fields' deposition testimony that he gave verbal commands and a warning prior to using the Taser.

[11] Fields stated they were giving her commands throughout the whole incident but admitted he could not remember specifically whether he warned her again before using the Taser the second time.

[12] Medical evidence confirmed the absence of drugs or alcohol in Skelly's system. (Doc. 91-9, at 2.)

In support of their motion for summary judgment, defendants also submitted excerpts of the expert testimony of Michael Brave. Brave states, in part, that the Taser log shows only device activation; it does not represent that a shock was actually delivered to a body nor does it distinguish between probe deployment and drive stun.

**Discussion**

Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir.1995). "The operative facts for this analysis are taken from the plaintiff's complaint and the plaintiff's response to the defendant's motion for summary judgment."[13] *Council v. Sutton*, No. 09-13968, 2010 WL 476708, at *4 (11th Cir. Feb. 12, 2010) (unpublished) (citing *Crenshaw v. Lister*, 556 F.3d 1283, 1291 (11th Cir. 2009)). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (also noting "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude" summary judgment). Whenever the nonmoving party has presented "sufficient, competent evidence" to support his or her version of the disputed facts, the court will resolve disputes in the plaintiff's favor. *See*

---

[13] A party may not rely on allegations in pleadings to oppose a properly supported motion for summary judgment. Fed. R. Civ. P. 56(e)(2). To the extent Skelly's deposition testimony contradicts her complaint, the court considers her sworn testimony.

*Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002). The court, however, will not make credibility determinations, weigh the evidence presented, "or choose between conflicting testimony." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008); *see also Anderson*, 477 U.S. at 255.

"'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (footnote omitted)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* The court may disregard "visible fiction" in cases where the responding party's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380-81. Courts are required to draw only "'all *reasonable* inferences'" in favor of the nonmoving party, not "all *possible* inferences." *Torjagbo v. United States*, 285 Fed.Appx. 615, 619 (11th Cir. 2008) (unpublished) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc)), *cert. denied*, 129 S. Ct. 984 (2009). A case need not be allowed to go to a jury on the basis of "implausible" inferences; "Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (internal marks omitted).

<u>Qualified Immunity Standard</u>

Ordinarily, law enforcement officers acting within the scope of their discretionary authority are entitled to qualified immunity from civil damages "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). There is no dispute in this case that the officers were acting within the scope of their discretionary authority. Thus, the burden

"shifts to the plaintiff to show that the grant of qualified immunity is inappropriate." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (internal marks and citations omitted). To satisfy this burden, the plaintiff must demonstrate (1) that the facts, viewed in the light most favorable to her, show the violation of a constitutional right; and (2) that the right allegedly violated was "clearly established" at the time of the incident. *See id.* (citing *Pearson*, 129 S. Ct. at 815-16). While this two-step sequence is often appropriate, the court has discretion to decide which of the two questions should be addressed first in light of the particular circumstances at hand.[14] *Pearson*, 129 S. Ct. at 818.

The qualified immunity defense provides immunity "not just from liability, but from *suit*," balancing the citizens' need for a remedy to protect their rights against the "need for government officials to be able to carry out their discretionary functions without the fear of constant baseless litigation." *GJR Investments, Inc. v. County of Escambia, Fla*, 132 F.3d 1359, 1366 (11th Cir. 1998). To this end, qualified immunity "protect[s] from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir.2003) (internal marks omitted). Importantly, it has long been held that "[q]ualified immunity represents the rule, rather than the exception." *GJR Investments,* 132 F.3d at 1366. For this reason, courts are admonished to "think long and hard before stripping defendants of immunity." *Id.* (internal marks omitted).

<u>Fourteenth Amendment Excessive Force</u>

Skelly alleges that the actions of Haynes and Fields amounted to excessive force in violation of her Fourteenth Amendment due process rights as a pretrial detainee.[15]

---

[14] In the context of a Fourteenth Amendment excessive force claim, as is at issue here, there is no qualified immunity if the constitutional violation is established, and thus no need to consider the "clearly established" question, because a Fourteenth Amendment excessive force violation "require[s] a subjective element that is 'so extreme' that no reasonable person could believe that [the] actions were lawful." *Danley v. Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008) (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1321-22 (11th Cir. 2002)). In other words, if the plaintiff alleges facts sufficient to demonstrate that the use of force was malicious and sadistic and for the purpose of causing harm as required in the Fourteenth Amendment context, "that is the end of the inquiry." *Skrtich v. Thornton*, 280 F.3d 1295, 1301-03 (11th Cir. 2002); *see also Council,* 2010 WL 476708, at *6 (stating "the right to be free from gratuitous force after a prisoner has been subdued is a clearly established constitutional right").

[15] Skelly asserts in the complaint that, because she was a pretrial detainee, the officers violated the Fourteenth Amendment. Some confusion exists, however, because the parties apply the Fourth – not the Fourteenth – Amendment legal standard of objective reasonableness in their arguments, which applies only

"Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause . . . ." *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996); *see also Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979) (discussing the Due Process Clause protection afforded to a pretrial detainee to be free from excessive force amounting to punishment). The analysis under the Fourteenth Amendment is the same as that applicable to claims under the Eighth Amendment, which applies to convicted prisoners, and thus Eighth Amendment cases are also instructive. *See Fennell v. Gilstrap*, 559 F.3d 1212, 1216 n.5 (11th Cir. 2009). "The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (internal marks and alterations omitted). An infliction of pain which is "totally without penological justification" is within that prohibition. *Id.* (internal marks omitted). Under the Fourteenth Amendment, the use of force is excessive and shocks the conscience in violation of due process rights if it was

---

when the excessive force arises out of "an arrest, investigatory stop, or other 'seizure' of a free citizen." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The first step in addressing an excessive force claim is to identify the source of the right allegedly infringed; the validity of the claim is then judged by reference to the constitutional standard which governs that right. *Id.* at 394. The Court in *Graham* expressly declined to decide "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins," but the Court noted it was clear "that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Id* at 395 n.10. "The precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit." *Hicks v. Moore*, 422 F.3d 1246, 1253 n.7 (11th Cir. 2005). The Eleventh Circuit recently (in 2009) applied the Fourteenth Amendment, not the Fourth, to an excessive force allegation where a suspect had been arrested, transported in a police car to the jail, and the alleged wrongful conduct occurred during the pat-down search shortly after his arrival. *See Fennell*, 559 F.3d at 1214-15. *Cf. Hicks*, 422 F.3d at 1253 n.7 (applying the Fourth Amendment standard despite the fact that the plaintiff already had been arrested, delivered to the jail, and begun but not completed the booking process but stating that because the defendants did not argue that the incidents of alleged wrongdoing were separate from the plaintiff's seizure, the court would "assume (for this case) Plaintiff was still being seized and analyze the claim under the Fourth Amendment"). Here, the parties agree that Skelly was a pretrial detainee, and the complaint so alleges. *See generally*, *Danley*, 540 F.3d at 1306 (noting "[t]he plaintiff is the master of the complaint . . . [and] selects the claims that will be alleged in the complaint") (internal marks omitted). Additionally, the facts here fit within the parties' characterization of Skelly as a pretrial detainee. Skelly had been arrested and taken to the Valparaiso Police Department, where she was charged; the original arresting officer had turned Skelly over to the police department transporting officers, who, in turn, delivered her to the custody of the jail; at the jail, Skelly underwent an initial pat-down search as part of the intake procedure at the time of the alleged wrongful conduct. The court, therefore, will apply the Fourteenth Amendment legal standard.

Case No. 3:08cv428/MCR/MD

"sadistically and maliciously applied for the very purpose of causing harm."[16] *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002). The use of force in the due process context does not "shock the conscience," however, if it was "applied 'in a good-faith effort to maintain or restore discipline,'" and not "'maliciously and sadistically to cause harm.'" *Fennell*, 559 F.3d at 1217 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). To evaluate whether a jailer's actions shock the conscience, the court considers the following factors: (1) the need for force; (2) the relationship between that need and the amount of force used; (3) the extent of the resulting injury;[17] (4) the extent of the threat to staff or other inmates, "as reasonably perceived by the responsible official on the basis of facts known to them;" and (5) "any efforts made to temper the severity of a forceful response." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986); *Fennell*, 559 F.3d at 1217; *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008). In applying this analysis, the court accords prison officials "wide-ranging deference" when they are acting "to preserve internal order and discipline and to maintain institutional security." *Whitley*, 475 U.S. at 321-22 (internal marks omitted); *see also Fennell*, 559 F.3d at 1217; *Danley*, 540 F.3d at 1307. Additionally, in the qualified immunity context, the Supreme Court has emphasized that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Taking the evidence of record as a whole and construing reasonable inferences in

---

[16] Although the defendants assert that the objective reasonableness standard of the Fourth Amendment applies equally under the Due Process Clause, the court disagrees. The court recognizes that some of the same considerations come into play, but the Fourteenth Amendment analysis of excessive force requires a higher standard – that of a malicious and sadistic intent – than that required under the Fourth Amendment's objective reasonableness standard. *See Graham,*, 490 U.S. at 1217. What is important in the Fourteenth Amendment context "is the mindset of the individual applying the force." *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009), *cert. denied*, 2010 WL 100590 (U.S. Mar. 22, 2010) (No. 09-903).

[17] However, the "'core judicial inquiry'" is "not whether a certain quantum of injury was sustained," but whether the force was used "'in a good-faith effort to maintain or restore discipline.'" *Wilkins v. Gaddy*, 130 S. Ct. 1175,  2010 WL 596513, at *2 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Conversely, "contemporary standards of decency" are always violated if a prison official maliciously and sadistically uses force to cause harm, regardless of whether significant injury occurs. *Id.* (internal marks omitted) (reversing a district court's decision that an allegation of purportedly *de minimis* injuries did not state an Eighth Amendment claim and emphasizing that the decisive inquiry is the nature of the force).

favor of Skelly, *see Pace*, 283 F.3d at 1276 (noting the court will resolve disputed facts in favor of the nonmoving party when "sufficient, competent evidence" supports the nonmoving party's version of the facts), the court finds that she has not set forth competent facts alleging a Fourteenth Amendment violation of her rights.  Because Skelly does not rely on any contrary evidence to dispute Officer Fields' actions as stated in his use-of-force report, the court will first consider his conduct, though it is the second incident chronologically.  Skelly admits she cannot remember the Taser incident involving Officer Fields.  However, she asserts that, viewing Fields' report in the light most favorable to her, she was restrained in a vehicle secure within the sally port of the jail, Fields tried no other means to get her to release her grip; and he applied the Taser shock without warning seven or eight times, as recorded in his Taser log.  The record, however, does not support a finding that Fields fired the Taser on a compliant and securely restrained detainee.  The record is uncontradicted that, although Skelly was handcuffed and shackled, she was tightly gripping the cage inside the transport vehicle and resisting the officers' attempts to get her to exit the vehicle.  Even assuming no warning was given, as Skelly asserts, Fields applied the first Taser shock to release Skelly's grip only after she had been struggling and kicking at windows and officers.  Given the fact that Skelly does not remember the incident at all and was in a combative state, it is unlikely a warning would have coerced her compliance.  The undisputed officers' reports of the incident indicate that they had tried to get Skelly out of the vehicle prior to Fields' use of the Taser.  Sergeant Haynes reported that she had kicked him when he tried to remove her from the vehicle.  Officer Robert Andrus reported that when officers attempted to remove Skelly from the vehicle, she grabbed hold of the cage "and would not release her hold on it despite the efforts of several officers to pull her hands loose." (Doc. 103-8.)  Mabou reported Skelly had been screaming and struggling and that she refused to cooperate.  Skelly was undeniably violently resisting the officers' efforts.

Skelly's behavior clearly warranted the application of force under the first *Whitley* factor, and the one Taser shock which succeeded in getting her to release her hold on the cage was rationally proportional to the need for force under the second *Whitley* factor.  *Cf. Fennell*, 559 F.3d at 1218 (noting Eleventh Circuit "precedent permits the use of force even

when a detainee is not physically resisting," and that force sufficient to break bones had been held permissible under certain circumstances where "the prisoner had not offered any physical resistance").  The third *Whitley* factor, requiring consideration of the extent of the resulting injury, also favors a finding that the force did not shock the conscience.  Although Skelly undoubtedly suffered moderate pain from the Taser (the pictures show the Taser marks or burns on her body though she does not remember the incident), there is no evidence that the injuries were serious.  *See Buckley v. Haddock*, 292 Fed. Appx. 791, 795 (11th Cir. 2008) (unpublished) (describing three Taser shocks as "at most– moderate, non-lethal force"), *cert. denied*, 129 S. Ct. 2381 (2009).  Also, Fields reasonably could have perceived, in light of Skelly's prolonged conduct of kicking at officers and trying to kick her way out of the car during transport, that Skelly was a threat to her own safety and that of the other officers who were present and attempting to get her out of the vehicle, satisfying the fourth *Whitley* factor.  The application of a single Taser shock in these circumstances, which was successful in getting her to release her grip, does not evidence a malicious or sadistic intent, nor can it even be said to be objectively unreasonable.  *See id.* at 794-96 (finding no excessive force under the Fourth Amendment where officers used a Taser shock three times on a suspect who was handcuffed and merely sitting by the side of the road but was resisting arrest by refusing commands to stand up and walk to the patrol car); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir.) (holding single use of a Taser gun was reasonably proportionate where suspect was hostile, belligerent, and uncooperative, under the Fourth Amendment objective reasonableness standard), *cert. denied*, 543 U.S. 988 (2004).  The *Whitley* factors all align in favor of finding no malicious or sadistic intent to cause harm on the part of Fields in this instance.

The undisputed record shows that Fields applied more Taser shocks after Skelly had been removed from the vehicle, at which point she immediately began resisting officers' attempts to restrain her properly.  According to Fields, it was necessary to remove one of Skelly's handcuffs in order to resecure her hands behind her back for safe transport to the medical center.  Skelly, however, struggled against the officers, resisting their efforts to get her hands out from under her, and she grasped onto herself to further resist.  Fields stated he applied a drive stun in an effort to get Skelly to comply, but it was unsuccessful.

A second drive stun was successful. Then, when officers removed one handcuff to reposition her arms behind her back, Skelly began biting her free hand. Although she did not draw blood, she continued biting at herself, which prevented the officers from freeing her hand to replace the handcuffs in the proper position. Again, Fields applied a drive stun to gain compliance, but it was unsuccessful. He noted in his report and testified at his deposition that the next drive stun succeeded in getting Skelly her to remove fingers from her mouth so the officers could reposition the handcuffs behind her back.

Considering the totality of the circumstances, neither the failure to give a warning in these rapidly changing circumstances nor the total number of times the Taser was used in this incident provides a basis from which to infer a malicious intent on the part of Officer Fields.[18] Skelly indisputably had been engaged in a prolonged struggle against the officers which began when Minor and Mabou first attempted to transport her to the medical center, and, at each juncture of Taser use by Fields, the facts indicate that Skelly was continuing to resist, struggling against officers, and causing a threat of injury to herself and the officers. Further, there is no evidence that Fields continued to use the Taser after Skelly had become compliant. Considering the *Whitley* factors with regard to Fields' continued Taser use, it is clear that force was needed to restrain Skelly from injuring officers or herself. The amount of force applied to coerce Skelly into a position where she could be properly restrained and to keep her from further injuring herself was proportional to the need because Fields testified that he applied additional drive stuns only after the first attempts were unsuccessful, and there is no evidence contradicting his testimony. The photographs depicting Skelly's injuries show several burn marks and bruis, but they are not disporportionate or shocking in light of her uncooperative conduct, struggling and resisting at the officers' every attempt to control and restrain her, which clearly (and rightfully so) caused Fields to perceive a threat of injury to other officers and to Skelly. The undisputed facts show that the Taser was used intermittently to gain the compliance of a resisting and

---

[18] The defendants' Taser expert, Brave, stated that the Taser log shows only the number of times the trigger was pulled. It does not indicate whether a charge was successfully delivered to the person, whether a drive stun or Taser probe was deployed, whether a Taser probe became dislodged, or whether the charge succeeded in achieving the person's compliance. (Doc. 93-4, at 10-12.)

violent detainee, and thus, Skelly has not demonstrated that Officer Fields used excessive force in violation of the Fourteenth Amendment.[19] Accordingly, Officer Fields is entitled to qualified immunity, and the court will grant summary judgment in his favor.

Turning next to the conduct of Sergeant Haynes (the first Taser incident) the court again finds no facts to support that the use of force was excessive. The only evidence Skelly offers to contradict the officers' version of the first Taser incident is her own deposition testimony that she was compliant when she arrived at the jail and was attacked with the Taser without reason. Skelly testified at her deposition, contrary to all objective evidence in the record, that during this first Taser incident, she was shocked until she became unconscious and did not regain consciousness until she awoke in the hospital. Skelly would have the court infer a malicious and sadistic intent on the part of Sergeant Haynes from her deposition testimony that she was compliant and from the Taser log, which indicates Haynes discharged his Taser eight to ten times. For the following reasons, the court concludes that on this record, an inference of malice would be implausible and unreasonable. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (noting the court views the facts and inferences in the nonmoving party's favor only "'*to the extent supportable by the record*'" (quoting *Scott*, 550 U.S. at 381 n.8)).

The record as a whole demonstrates that Skelly's conduct was indisputably volatile and combative on the day in question. Skelly presented no evidence to contradict or oppose Officer Ratcliff's recitation of the circumstances surrounding Skelly's arrest and her attendant violent and combative conduct at the police department shortly before she was delivered to the jail. Tellingly, in her deposition testimony, Skelly admitted that when she arrived at the jail, she did not know why she had been arrested. She stated, "I had no idea

---

[19] For these same reasons, the court also would find Fields' actions to be objectively reasonable under a Fourth Amendment analysis. *See Mann v. Taser In'l Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) (holding officer's use of Taser during an arrest and after she had been handcuffed was reasonable where the suspect's behavior was violent, aggressive and prolonged and the evidence demonstrated she was clearly a danger to herself and others). "In a 'difficult, tense and uncertain situation' the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (quoting *Draper*, 369 F.3d at 1278) (holding use of a Taser on a handcuffed arrestee was not unreasonable). Such was the case here.

Case No. 3:08cv428/MCR/MD

Case 3:08-cv-00428-MCR-MD   Document 154   Filed 03/22/10   Page 16 of 20

Page 16 of 20

why I was being arrested. At this point I was still mind-boggled over why all of this had happened." (Doc. 102-1, at 8.) She admits she does not remember the later events reported by Fields regarding the second Taser incident at the jail, which occurred within one-half hour of Sergeant Haynes' Taser use, but she does not argue she had been unconscious throughout that second incident as her deposition testimony would imply.[20] Instead, Skelly assumes the facts as reported by the officers regarding the incident with Officer Fields and her transport to the hospital. Skelly presented no medical evidence indicating she was unconscious when she arrived at the hospital less than one hour after the incident involving Sergeant Haynes, and the objective record demonstrates she was highly combative and aggressive at that time. Nurse White testified Skelly was combative – thrashing around, yelling, and kicking. She stated, "I think at some point she probably hit all of us. That's how combative she was." (Doc. 91-12, at 6.) Nurse White concluded that Skelly was either experiencing a psychotic episode when she arrived at the hospital or was under the influence of some type of chemical, but Skelly's subsequent hospital blood work showed the absence of drugs or alcohol in her system.

The only reasonable inference to be drawn from this record is that Skelly's memory of the events is incomplete and not grounded in reality. The undisputed record as a whole confirms Skelly was undergoing a psychotic episode of some sort on the day in question, leaving her with a dim and incomplete memory of the day's events. The court is mindful of the duty to refrain from making credibility determinations on summary judgment but cannot turn a blind eye to the undisputed evidence demonstrating Skelly's impaired mental state during these events, which makes her account wholly unreliable and not competent.[21]

---

[20] In her memorandum in opposition to summary judgment, Skelly represents that she has no independent recollection of any of the events after Haynes initially used the Taser on her, but instead of arguing that Fields' conduct in the second incident shocks the conscience because he used the Taser on an unconscious detainee, she assumes and argues the facts as presented in the officers' use-of-force reports. Because Skelly did not rely on her deposition testimony that she was unconscious regarding the second Taser incident, the court concluded she presented no evidence to contradict the officers' reports of the second incident for summary judgment purposes.

[21] The court may not engage in "credibility determinations or choose between conflicting testimony" on summary judgment, *Burnette,* 533 F.3d at 1330, and a mere disagreement over whose version of the incident should be believed is quintessentially a question of fact for the jury. *See Hammer v. Slater*, 20 F.3d 1137, 1143 (11th Cir. 1994) ("At the heart of this dispute are issues of credibility: whether one believes [the

Here, even in the absence of a videotape of the incident, the court concludes that the undisputed, uncontradicted evidence in the record clearly reveals that the plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed [her]." *Scott,* 550 U.S. at 380-81 (holding the court should have taken the facts from the objective videotape of the incident). Courts are required to draw only "'all *reasonable* inferences'" in favor of the nonmoving party, not "all *possible* inferences." *Torjagbo*, 285 Fed.Appx. at 619. Thus, in light of all of the undisputed evidence on the record regarding the events that day and Skelly's state of mind, her testimony that she was compliant and attacked without reason is insufficient to give rise to an inference that Sergeant Haynes acted with a malicious and sadistic intent to cause harm.

Skelly also points to the number of times Haynes' Taser log shows he activated his Taser, which she states shows he pulled the trigger eight to ten times, and that, viewing the facts in the light most favorable to her, he gave no warning. Haynes testified that one of the probes became dislodged, he was not able to consistently make contact to discharge the Taser properly due to Skelly's combative conduct, and that he did not remember giving a warning, though other officers testified he did. The court views this in the light most favorable to Skelly and assumes Haynes gave no warning. Nevertheless, as noted previously, Skelly presented no evidence to contradict the testimony of the defendants' expert, Brave, who testified that the Taser log itself does not indicate whether a charge was successfully delivered to the person, whether a drive stun or Taser probe

---

plaintiff's] evidence or that of the [defendants]. We have repeatedly held that credibility is a factual issue that is uniquely the province of the jury."). These authorities are distinguishable because in this case, the undisputed record shows plaintiff's evidence is not competent due to her mental state at the time. For the same reason, the case of *Council*, 2010 WL 476708, at *1 - *5, is distinguishable. There, the court affirmed the denial of summary judgment to deputies who had used a Taser on a detainee, crediting the plaintiff detainee's version of the facts. Contrary to the deputies' affidavits, which stated the detainee was not complying with their orders, Council claimed he was compliant and on his knees with his hands in the air when the deputies entered his cell, angry and screaming, and shocked him with the Taser repeatedly until he was nearly unconscious. *Id.* Crediting Council's allegations for summary judgment purposes, the court found the facts sufficient to demonstrate excessive force and to infer a malicious and sadistic intent to harm from the use of the Taser on a compliant detainee and circumstantial evidence of the deputies' anger. *Id. Council* does not control the outcome here because in that case, there was no undisputed record showing that the detainee's mental state and memory were incomplete or impaired at the time of the incident. In this case, the court concludes it would be contrary to the principles underlying qualified immunity to deny its benefits to Sergeant Haynes on the basis of testimony which the court finds is not competent.

Case No. 3:08cv428/MCR/MD

was deployed, whether a Taser probe became dislodged, or whether the charge succeeded in achieving the person's compliance. The number of times the device was "activated" according to the log therefore is not necessarily an accurate record of the number of times the detainee received a Taser shock, and therefore it is insufficient by itself to give rise to an inference of a malicious or sadistic intent.

Additionally, the absence of a warning in the circumstances facing Haynes is not dispositive. The incident developed rapidly, and the circumstances as represented in the officers' use of force reports and depositions indicate Skelly quickly became out of control. Skelly resisted the pat-down, became increasingly agitated, and resisted Minor's effort to escort her into the receiving area by grabbing door frames and then suddenly jerking away from Minor, justifying intervention by Haynes and some use of force to gain control. This satisfies the first *Whitley* factor. *See Whitley*, 475 U.S. at 320 (noting the use of force "ultimately turns on whether force was applied in a good faith effort to restore discipline"). Haynes' repeated use of the Taser when Skelly kept struggling and resisting the officers' attempts to restrain her was rationally proportional to the need for force and her injuries were moderate, but not serious, for purposes of the second and third *Whitley* factors. *See Buckley*, 292 Fed. Appx. at 795 (describing three Taser shocks as "at most– moderate, non-lethal force"). Haynes had been warned by the Valparaiso Police Department in advance of Skelly's arrival that she was combative, and in these rapidly changing circumstances, he reasonably could have perceived a threat to Minor or himself, satisfying the fourth *Whitley* factor. It appears that the officers restrained Skelly as soon as they could do so after she had been incapacitated by the Taser, preventing further Taser use. There is no competent evidence indicating that Haynes continued to apply the Taser shocks after Skelly had been subdued and restrained. The court concludes that the record as a whole does not give rise to any reasonable inference that Haynes acted with a malicious or sadistic intent to cause harm, and no *rational* juror could find in favor of the plaintiff on her Fourteenth Amendment claim against him.[22] *See Scott*, 550 U.S. at 380.

---

[22] Aside from one statement in her argument regarding the state law battery claims, *see* Fla. Stat. § 768.28(9), Skelly does not even *argue* that Haynes acted out of a malicious or sadistic intent. Instead, she asserts only that Haynes' actions were not objectively reasonable, which is the Fourth Amendment standard.

Accordingly, the court will grant summary judgment to Sergeant Haynes.

Battery Claims

This court has supplemental jurisdiction to consider Skelly's state law claims. *See* 29 U.S.C. § 1367. These claims arise out of the same nucleus of operative fact as her federal claims. In Count II of the complaint, a state-law battery claim is stated against Sergeant Haynes and Officer Fields in their individual capacity based on the same conduct discussed above, asserting that the officers' conduct was intentional, willful, wanton or malicious. In Florida, no officer shall be held personally liable in tort for acts within the scope of the officer's employment, unless the act "was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. 768.28(9)(a). On the basis of the previous discussion, the court will grant summary judgment to Sergeant Haynes and Officer Fields on Count II because the record does not support any inference that their conduct was willful, wanton or malicious.

Alternatively, Skelly stated in Count III a claim against the County for state law battery on the doctrine of *respondeat superior*, in the event it was determined that Haynes and Fields acted intentionally but not willfully, wantonly, or maliciously. *See* Fla. Stat. § 768.28 (waiving sovereign immunity in tort actions, with some exceptions, notably excluding government liability for an employee's malicious conduct). "Florida law allows a plaintiff to recover against a municipality for the tortious acts of its employees based upon *respondeat superior*." *Brown v. City of Clewiston*, 848 F.2d 1534, 1543 n.18 (11th Cir. 1988) (citing *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1122-23 (Fla. 4th DCA 1987), *review denied*, 519 So. 2d 986 (Fla. 1988)). Like an excessive force claim under the Fourth Amendment, "[a] battery claim for excessive force is analyzed by focusing

---

Alternatively, even considering Haynes' actions under the objective reasonableness standard, the court finds, for the same reasons listed above, that there is no competent evidence in this record from which a rational trier of fact could infer that the actions of Haynes were objectively unreasonable. *See Oliver*, 586 F.3d at 905-06 (noting the Fourth Amendment inquiry must allow "'for the fact that officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation'") (quoting *Graham*, 490 U.S. at 397); *Draper*, 369 F.3d at 1278 (same).

Case No. 3:08cv428/MCR/MD

upon whether the amount of force used was reasonable under the circumstances." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA) (citing Fla. Stat. § 776.05(1)), *review denied*, 683 So. 2d 484 (Fla. 1996)).  The County seeks summary judgment on grounds that the officers' conduct was reasonable under the circumstances.  Because the court alternatively concluded above that Skelly cannot show the conduct of Sergeant Haynes or Officer Fields was unreasonable under the Fourth Amendment, there is therefore no basis on which the County could be liable under the doctrine of *respondeat superior* regarding their actions.  Absent a triable issue, the County is entitled to summary judgment.

**Conclusion**

Accordingly, it is hereby ORDERED:

1.  The summary judgment motion of Defendants Nolan Haynes and Dennis Fields (doc. 92) is GRANTED.

2.  Defendant Okaloosa County Board of County Commissioners' motion for summary judgment on Count III (doc.91) is GRANTED.

3.  The clerk shall enter final judgment in favor of Defendants Haynes and Fields and the Okaloosa Board of County Commissioners and against the Plaintiff on the Plaintiff's claims against each defendant respectively.

**DONE AND ORDERED** this 22nd day of March, 2010.

*s/ M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**